IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMMON MIKELL, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 10-402 |
| | : | |
| MARRIOTT INTERNATIONAL, INC., | : | |
| d/b/a PHILADELPHIA MARRIOTT WEST, | : | |
| | : | |
| Defendant. | : | |

May _19th_ , 2011                                                                                         Anita B. Brody, J.

## MEMORANDUM

### I.      Introduction

Plaintiff Ammon Mikell ("Plaintiff" or "Mikell") has brought suit against Defendant Marriott International, Inc., doing business as Philadelphia Marriott West ("Defendant" or "Marriott"),[1] under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 951 *et seq.*[2] Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Defendant has filed a Motion for Summary Judgment. For the reasons set forth below, I will grant in part and deny in part that Motion.

### II.     Background[3]

Plaintiff Ammon Mikell is a black male and former employee of Defendant Marriott. Compl. ¶ 2, ECF No. 1; Def.'s Stat. Mat. Facts ¶ 6, ECF No. 14. Marriott manages the

---

[1] Defendant states in its Motion for Summary Judgment that Mikell has incorrectly sued "Marriott International, Inc." and that the proper name is Marriott Hotel Services, Inc. Def.'s Stat. Mat. Facts 1, ECF No. 14.
[2] This is Mikell's fifth suit against an employer or would-be employer, and at least the third alleging discrimination. *See* Mikell Dep. 7:6-10:6, 24:14-25:6, 26:6-16, 27:19-28:24, ECF No. 14.
[3] On a motion for summary judgment, the facts are interpreted in the light most favorable to the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). All facts below are taken from Mikell's statements of the case, or from Defendant's when undisputed.

Philadelphia Marriott West, a hotel in West Conshohocken, Pennsylvania. Def.'s Stat. Mat. Facts ¶ 1.

On October 18, 2000, Mikell was hired by Marriott as a Loss Prevention Officer. Compl. ¶ 12; Def.'s Stat. Mat. Facts ¶ 6. A Loss Prevention Officer is responsible for ensuring the safety of Marriott's clients, employees, and property; duties include patrolling the interior and exterior of the hotel, as well as the parking garage. Def.'s Stat. Mat. Facts ¶ 7.

In 2003, Mikell applied for a position as an Accountant at the hotel but was not selected. *Id.* ¶ 9. On January 22, 2004, he filed a complaint against Marriott with the Pennsylvania Human Relations Commission (PHRC), Compl. ¶ 7, alleging discrimination and retaliation based on Marriott's failure to promote him, Def.'s Stat. Mat. Facts ¶ 37.

In September of 2007, Mikell applied for the position of Loss Prevention Supervisor. Pl.'s Stat. Mat. Facts ¶ 1, ECF No. 15; Def.'s Stat. Mat. Facts ¶ 13; Compl. ¶ 13. Loss Prevention Supervisors are similar to Loss Prevention Officers, but have the additional duties of supervising the daily operations of the hotel security unit, including identifying and/or responding to any and all security related incidents, issues, or concerns, and supervising a staff of Loss Prevention Officers. Compl. ¶ 14.

In October of 2007, Mikell learned that he would not be offered the position of Loss Prevention Supervisor. Compl. ¶ 16. Marriott sent him a letter stating, "We have reviewed your qualifications and while we appreciate your interest, we are currently pursuing other candidates whose background and skills more closely fit our current need." Resp. Ex. 3, ECF No. 15. Mikell also received a note card from Tom Logan stating that "we have decide[d] on one of the other candidates." *Id.* Later, Marriott wrote in an answer to a subsequent PHRC complaint by Mikell that the legitimate, nondiscriminatory reason that Mikell was not selected was that he

2

"voluntarily withdrew his application for the position," and Tom Logan submitted a sworn statement to the PHRC to this effect. Pl.'s Stat. Mat. Facts ¶¶ 4-6; Resp. Ex. 2 ¶ 12; Resp. Ex. 5.

Ultimately, Ellen Abadie ("Abadie"), a white female, received the position. Def.'s Stat. Mat. Facts ¶ 15; Compl. ¶ 17. Abadie had also been a Loss Prevention Officer at the Philadelphia Marriott West from 2003 until 2007. Def.'s Stat. Mat. Facts ¶ 17. Before this, from 1990 until 2003, Abadie had worked at another Marriott property in Haverford, Pennsylvania. *Id.* ¶ 18. She had become a Loss Prevention Officer there on August 4, 1997. *Id.*

On June 19, 2008, a guest at the hotel reported that gasoline had been siphoned from his or her car overnight. *Id.* ¶ 21. Abadie investigated the complaint by reviewing security footage and discovered that no Loss Prevention Officer had patrolled the garage during the night. *Id.* ¶ 22. Abadie then reviewed the patrol log, a company document where Loss Prevention Officers record their activities while on duty. *Id.* ¶ 23. In the log, Mikell, the officer on duty at the time, had written: "03:05 Ammon is patrolling the garage levels. 03:15 Ammon is clear from above." Pl.'s Stat. Mat. Facts ¶ 11; *see also* Def.'s Stat. Mat. Facts ¶ 23. On June 20 or 21, 2008, Mikell was suspended with intent to terminate for falsification of company records. Def.'s Stat. Mat. Facts ¶ 24. Compl. ¶ 20; Duffy Decl. Ex. 5.

When an employee is suspended, Human Resources at the Philadelphia Marriott West conducts an investigation to determine whether termination is appropriate. Rodden Decl. ¶ 4, ECF No. 14. Falsification of company records appears in Marriott's Associate Handbook for employees as an offense providing grounds for immediate termination. Def.'s Stat. Mat. Facts ¶ 4; Duffy Decl. ¶ 6; *id.* Ex. 3. Elizabeth Duffy, Director of Human Resources at the hotel, conducted an investigation into the incident giving rise to Mikell's suspension. Def.'s Stat. Mat. Facts ¶ 26.

During the investigation, in defense of his log entry, Mikell stated that on occasion he would just patrol the "garage level," which entailed merely looking out from the elevators through the glass doors into the garage level to see that nothing out of the ordinary was going on, without actually patrolling inside the garage. Pl.'s Stat. Mat. Facts ¶ 13. According to Mikell, when he actually went out into the garage itself to patrol, he would enter comments into the log about the cars or vehicles in the garage. *Id.* ¶ 14. The log entry in question made no mention of cars or vehicles in the garage. *Id.* ¶ 15. Thus, Mikell maintained that his log entry did not indicate that he actually patrolled the garage and as a result was not falsified. *Id.* ¶ 16. In conducting her investigation of the incident, Duffy interviewed other Loss Prevention Officers at the facility and concluded that "patrolling the garage levels" was "consistently understood to mean walking throughout the garage." Def.'s Stat. Mat. Facts ¶ 31.

On June 24, 2008, Mikell's counsel submitted a letter to Marriott stating that Mikell "would like to return to work without taking further action to address what he believes may be illegal discrimination in the workplace." Pl.'s Stat. Mat. Facts ¶ 9; Resp. Ex. 3. On July 8, 2008, Mikell complained to Duffy during an interview that he was discriminated against and believed that there was a conspiracy to terminate him. Pl.'s Stat. Mat. Facts ¶ 7.

When Duffy had completed her investigation, she recommended that Mikell be terminated for falsification of company records, and General Manager Michael Rodden ("Rodden") approved her recommendation. Def.'s Stat. Mat. Facts ¶¶ 32-33. Mikell then appealed his termination directly to Rodden. *Id.* ¶ 34. Mikell requested that Rodden review the log, but Rodden stated that there was "no need for that" and upheld the termination decision. Pl.'s Stat. Mat. Facts ¶ 18. Mikell's employment with Marriott ceased on July 15, 2008. Compl. ¶ 21; Def.'s Stat. Mat. Facts ¶ 6.

On July 21, 2008, the EEO Compliance Manager at Marriott, Leslie O'Bryant, received a complaint from the PHRC, signed by Mikell and dated March 11, 2008. Def.'s Stat. Mat. Facts ¶ 38. Also on July 21, 2008, O'Bryant received an "Amended Complaint," signed by Mikell and dated June 24, 2008. *Id.* ¶ 39. Two weeks later, O'Bryant received a "Second Amended Complaint." *Id.* ¶ 40. The PHRC dismissed the case in the summer of 2009; the EEOC issued a right-to-sue letter on November 4, 2009. Compl. ¶¶ 9-10.

### III.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir. 1997). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot rely upon "bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The threshold inquiry at the summary judgment stage involves determining whether there is the need for a trial, that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. Discussion

Mikell brings claims under § 1981 (Count I), Title VII (Count II), and the PHRA (Count III) for Marriott's retaliatory and discriminatory failure to promote and termination. As to Mikell's discrimination claims, Marriott moves for summary judgment on the grounds that it had legitimate reasons for refusing to promote and for terminating Mikell. Mikell counters that Marriott's reasons are pretexts for racial discrimination. As to Mikell's retaliation claims, Marriott argues that any actions by Mikell that could have fueled retaliation were too far removed in time from Marriott's failure to promote and termination of Mikell. Mikell responds that he complained of racial discrimination immediately prior to his termination, and that he was terminated in retaliation for those complaints. I will deny Defendant's Motion as to Mikell's discriminatory failure to promote claim, but grant Defendant's Motion as to Mikell's remaining claims.

### A. Discriminatory Failure to Promote

Mikell first claims that Defendant discriminated against him in failing to promote him to the position of Loss Prevention Supervisor in the fall of 2007.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims brought under Title VII, 42 U.S.C. § 1981, and the PHRA. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Jones v. Sch. Dist.*, 198 F.3d 403, 410 (3d Cir. 1999) (applying the same framework to all three types of claims).

For failure to promote claims, "[t]he initial burden is on the employee" to show that "(1) [he or she] is a member of a protected class, (2) [he or she] sought and was qualified for the promotion, (3) [he or she] was rejected for the promotion, and (4) a non-member of the protected class was treated more favorably." *Young v. Pennsauken Twp. Sch. Dist.*, 47 F. App'x 160, 161 (3d Cir. 2002) (citing *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997)). If an employee makes out this prima facie case, he or she is entitled to an inference of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981).

Then the burden shifts to the employer to produce a "legitimate, non-discriminatory reason for the employee's rejection," *id.* at 253, "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

"If the employer produces a legitimate reason, the burden shifts back to the employee, who must show that the reasons offered by the employer are mere pretexts for discrimination." *Young*, 47 F. App'x at 161 (citing *Burdine*, 450 U.S. at 252-53; *Jones*, 198 F.3d at 410).[4] To

---

[4] Within this framework, although the burden of production shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

show pretext, and survive a motion for summary judgment, an employee must identify "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Discrediting an employer's proffered reason requires a demonstration of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Elaborating on inconsistency in particular as evidence of pretext, the Third Circuit explained in *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001), that "[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." In *Abramson*, a professor alleged religious discrimination in her termination. *Id.* at 281. In an internal memo, before the New Jersey Division on Civil Rights, and at a deposition, different reasons were given for her firing. *Id.* at 282-83. Ultimately the Third Circuit found these to be the sort of inconsistencies anticipated by *Fuentes*. *Id.* at 284. Similarly, in *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 281 (3d Cir. 1998), the Third Circuit held that a district court should have given a more forceful pretext instruction to the jury when an employer had given different rationales to the EEOC and to the trial court.[5] In *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-55 (3d Cir. 1997), the Third Circuit

---

[5] The differing rationales were as follows: "In defense of its action in failing to renew Smith's contract, the Borough elicited testimony from Council members that Smith's performance on the job had been inadequate. Smith then offered evidence that the Borough had not criticized Smith's performance at prior hearings before the Equal Employment Opportunity Commission and the Pennsylvania Commission on Human Relations and in its responses

8

found that an EEOC suit was not frivolous in part due to the fact that an employer had given unrelated explanations for termination in his deposition and at trial. *See also Hoechstetter v. City of Pittsburgh*, 79 F. App'x 537, 540 (3d Cir. 2003) (citing *Abramson*, *Smith*, and *L.B. Foster* as examples of cases where "pretext was evidenced by the decision-maker's having totally different and unrelated rationales for the employment decision at different stages of the litigation"); *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986) ("The district court noted the inconsistency in Small Tube's explanations of its refusal to rehire and could appropriately have taken that into account.").

In moving for summary judgment, Marriott assumes that Mikell has set forth a prima facie case of discrimination, and presents its legitimate, nondiscriminatory reason for its failure to promote him, namely Mikell's lack of experience as compared to Abadie, the employee who received the promotion. Mikell attempts to demonstrate that Marriott's reason is pretextual by pointing to inconsistencies in Marriott's case, mainly that Marriott argued before the PHRC that its reason for failing to promote Mikell was Mikell's withdrawal of his application, whereas Marriott now argues that its reason for failing to promote Mikell was Abadie's superior qualifications. Marriott replies that it made the assumption that Mikell had not withdrawn his application for purposes of summary judgment only, and that it has not advanced inconsistent positions in the litigation so as to give rise to a finding of pretext.

There are sufficient inconsistencies in this case to allow Mikell to survive Defendant's Motion for Summary Judgment. After Mikell applied for the promotion, Marriott sent him a

---

to Smith's interrogatories. Instead, the Borough explained that it did not renew Smith's contract because Smith had not timely applied for the position." *Id.* at 275. Presented with this evidence, the court concluded that "jurors must be instructed that they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision." *Id.* at 280. Although *Smith* was an ADEA case, the ADEA and Title VII frameworks are similar. *See id.* at 278 n.3.

letter stating, "We have reviewed your qualifications and while we appreciate your interest, we are currently pursuing other candidates whose background and skills more closely fit our current need." Resp. Ex. 3. Tom Logan also sent Plaintiff a handwritten note stating, "Thank you for your intrest [sic] in the Loss Prevention Supervisor. We have decide [sic] on one of the other canidates [sic]." *Id*. Both letters at least arguably imply that Mikell's application had remained in contention until another application was chosen, and that Marriott selected another applicant over Mikell. However, before the PHRC, Marriott averred in its answer that Mikell "voluntarily withdrew his application for the position." Resp. Ex. 2 ¶ 12. Similarly, Tom Logan submitted a sworn statement that, during his interview, "Mr. Mikell said that he wished to be removed from consideration" and "would like to withdraw." Resp. Ex. 5. Now, in moving for summary judgment, Defendant argues that Mikell did not receive the promotion due to his lesser experience as compared to the successful candidate. Mem. Supp. Summ. J. 10-11, ECF No. 14.

Defendant maintains that it adopted this last position for summary judgment purposes only, when it was required to take the facts in the light most favorable to Plaintiff and to accept his assertions that he had not withdrawn his application and that experience was the relevant criteria. Regardless of any confusion engendered by required inferences or assumptions at summary judgment, however, there were preexisting inconsistencies in the record, namely the potential conflicts between Marriott's letter to Mikell and answer to the PHRC, and between Tom Logan's note and sworn statement. From these changes, a reasonable factfinder could find Defendant unworthy of credence. Thus I will deny Defendant's Motion as to Mikell's pretextual failure to promote claim.

### B. Discriminatory Termination

Mikell also claims that Marriott discriminated against him in terminating him as a Loss Prevention Officer in the summer of 2008.

The *McDonnell Douglas* burden-shifting framework also applies to claims of discriminatory termination. As outlined above, "[i]f the plaintiff establishes the elements of a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its employment decision." *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 278 (3d Cir. 1998).

The Third Circuit has commented that the employer's burden at this stage is "relatively light," and requires only an articulation of a legitimate reason for the unfavorable employment decision in question. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*[6]

"Once such a justification is proffered, the burden then reverts to the plaintiff to prove by a preponderance of the evidence that the articulated reason is a pretext." *Smith*, 147 F.3d at 278. As presented above, this requires the identification of "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

"To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ." *Id.* at 765. Rather, the plaintiff "must show . . . that the employer's proffered reason . . . was so plainly wrong that it cannot have been the

---

[6] "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id*.

employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). "A denial that [a plaintiff] engaged in the conduct for which he [or she] was purportedly terminated is insufficient to create a genuine issue of material fact." *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010) (citing *Waggoner v. Garland*, 987 F.2d 1160, 1165-66 (5th Cir. 1993)); *see also Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 528 (3d Cir. 2007) ("[A] plaintiff may not defeat summary judgment merely by questioning the business judgment behind an employer's decision, absent other evidence of impermissible motives." (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 825-28 (3d Cir. 1991)).[7]

In this case, Marriott contends that its legitimate, nondiscriminatory reason for terminating Mikell was his falsification of company records, and that Mikell cannot produce any evidence that this reason was fabricated. Mikell counters that pretext can be inferred from his submissions that he did not in fact falsify company records, and from Rodden's refusal to personally interpret Mikell's log entries.[8]

An application of Third Circuit precedent to these arguments reveals that Mikell has not cast sufficient doubt on Marriott's reason. As stated numerous times in this Circuit, mistakes or errors made by Marriott in reaching its decision to terminate Mikell do not, in and of themselves, give rise to a finding of pretext. Thus, Mikell's allegation that he did not in fact falsify records does not allow him to survive Defendant's Motion for Summary Judgment.

Mikell argues that in addition to being wrong, Marriott refused to apprise itself of the truth. When Mikell asked Rodden to review the logs to verify that Mikell distinguished between

---

[7] As already discussed, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

[8] Mikell appears to counter Defendant's Motion on his retaliatory termination claim only, and advances no freestanding defense to Defendant's Motion on his discriminatory termination claim. However, to the extent that Mikell's response contains arguments against Defendant's Motion on his discriminatory termination claim, I consider those arguments here.

patrolling the garage and patrolling the garage levels, and that therefore his entries were truthful, Rodden declined. A mere refusal to reread documents at the appellate stage of a termination decision, however, does not represent a weakness, implausibility, inconsistency, incoherency, or contradiction so grave that a factfinder could deem Defendant's explanation to be unworthy of credence.[9]

In sum, Mikell has not met his burden in arguing that Marriott's articulated reason for termination is a pretext. As a result, I will grant Defendant's Motion on this claim.

### C. Retaliation

Mikell next claims that he was not promoted and was terminated in retaliation for his opposition to Marriott's unlawful employment practices.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected

---

[9] Indeed, any inconsistencies on this issue seem to appear in Mikell's case, rather than Marriott's. Mikell suggests that his entries of "patrolling the garage levels" were intended to mean that he did not actually walk through the garage, whereas his entries of "patrolling the garage" were intended to mean that he did actually walk through the garage. *See, e.g.*, Mikell Dep. 178:10-181:17. As support for this distinction, Mikell claims that he would state whether or not the vehicles were in order when he was patrolling the garage, indicating that he had actually walked through the garage, but that he would not reference vehicles when he was patrolling the garage level, indicating that he had not actually walked through the garage. *Id.* However, Mikell's own submissions include log entries where he does not appear to abide by this distinction, writing several times, "Ammon is patrolling the garage levels," immediately followed by "Ammon reports all vehicles appear to be in order." Resp. Ex. 8. Thus "patrolling the garage levels" does seem to have meant on occasion that Mikell actually walked through the garage, thereby undermining Mikell's arguments to the contrary.

13

activity and the employer's adverse action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Id.* (internal quotation and citation omitted).

In moving for summary judgment, Defendant argues that Mikell's only protected activities are the 2004 and 2008 PHRC complaints, neither of which can give rise to an inference of causation: the 2004 complaint was too far removed in time from Mikell's failed promotion and termination, while the 2008 complaint was received after both adverse actions. Defendant also suggests that Mikell has no other evidence of a causal link to support his retaliation claims. In responding, Mikell asserts that the protected activities in question are the informal complaints he made in the weeks and days before his termination, which were so close in time to his firing that they give rise to an inference of causation on his retaliatory termination claim. Mikell does not clearly defend his retaliatory failure to promote claim. Defendant replies that Mikell's informal complaints were too vague to constitute protected activity, and came after it had begun to contemplate his termination.

### 1. 2008 Informal Complaints Not Protected Activity

Protected activity extends beyond formal complaints filed with the EEOC or the PHRC, and can include "'informal protests of discriminatory employment practices, [such as] making complaints to management, writing critical letters to customers, [and] protesting against discrimination by industry or society in general.'" *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). However, the Third Circuit has also held that "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII" and

that "opposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context." *Id.* "[C]omplaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'" *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).

Neither of Mikell's 2008 informal complaints rises to the level of protected activity. On June 24, 2008, a few days after Mikell was suspended, his lawyer sent a letter to Marriott, requesting that Marriott "review the circumstances surrounding [Mikell's] suspension and reinstate [Mikell] to his position without undue delay." Resp. Ex. 3. The letter also stated that Abadie had previously suspended Mikell "without a legitimate basis." *Id.* Finally, the letter noted that "Mr. Mikell would like to return to work without taking further action to address what he believes may be illegal discrimination in the workplace." *Id.* Thus, while action by the employer is described, and the word "discrimination" is used, it is unclear whether Mikell found that very action to be discriminatory, or if he was referring to other behavior in the workplace. Furthermore, there is no mention of the protected class in question, and no allegation of race-based discrimination. Somewhat similarly, on July 8, 2008, Mikell told Duffy during his interview that he was "being discriminated against," that there was "a conspiracy to get [him] out," that he was "being constantly harassed with frivolous write-ups," and that "things of that nature" were taking place. Mikell Dep. 196:8-15. Mikell has submitted no evidence as to the nature or content of his complaints as voiced to Duffy at that time. Thus, as framed in his deposition, Mikell's allegations at the interview included few if any specifics regarding the practices or the perpetrators, and did not invoke race. As with Mikell's counsel's letter, Mikell's complaints to Duffy also fail to rise to the level of protected activity. In sum, neither

15

communication constitutes protected activity for purposes of a prima facie case of retaliation under Title VII.[10] For this reason, Mikell's retaliatory termination claim based on his 2008 informal complaints cannot stand.

### 2. Employment Decision Contemplated Before Informal Complaints

Even if Mikell's informal complaints constituted protected activity, because Marriott was already contemplating his termination, this retaliation claim fails. In *Clark County School District v. Breeden*, 532 U.S. 268, 271-72 (2001) (per curiam), a supervisor revealed to a union director that she was contemplating transferring an employee to a different position on April 10. The supervisor then became aware that the employee had filed a lawsuit on April 11. *Id.* at 272. The employee was ultimately transferred in May. *Id.* Although the employee later tried to assert a retaliation claim stemming from her April 11 lawsuit and May transfer, the Supreme Court wrote: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* at 272. Similarly, in *Curay-Cramer*, 450 F.3d at 137, the Third Circuit commented that "an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity." In that case, the plaintiff, a Catholic schoolteacher, had signed her name to a pro-choice publication. *Id.* at 132. The defendant contemplated firing her immediately upon seeing the advertisement. *Id.* at 137. Before the final termination decision was made, the plaintiff indicated that she would oppose termination as discriminatory, and later

---

[10] *See also, e.g.*, *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006); *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004); *Young v. Sch. Dist.*, No. 06-4485, 2009 U.S. Dist. LEXIS 88848 (E.D. Pa. Sept. 24, 2009); *Dodd v. SEPTA*, No. 06-4213, 2008 U.S. Dist. LEXIS 56301, at *40-41 (E.D. Pa. July 23, 2008); *Flax v. Del. Div. Family Servs.*, No. 03-922, 2008 U.S. Dist. LEXIS 31887, at *46-47 (D. Del. Apr. 16, 2008); *Boyce v. Pa. Dep't of Transp.*, No. 04-0110, 2006 U.S. Dist. LEXIS 85325, at *17-18 (W.D. Pa. Nov. 22, 2006) ("The complaint must specifically mention the plaintiff's belief that he or she was discriminated against on account of her or her membership in some protected class.").

based a retaliation claim on that complaint combined with her subsequent termination. *Id.*
However, the Third Circuit found for the defendant:

> The caselaw provides that an employee may not insulate herself from termination by covering herself with the cloak of Title VII's opposition protections *after* committing non-protected conduct that was the basis for the decision to terminate. If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress.

*Id.* In both cases, employees protested discriminatory employment practices after their employers began to contemplate termination but before ultimate termination. Both courts found that the timing of the allegations of discrimination could not support a claim of retaliation.

Similarly, in this case, Marriott suspended Mikell pending termination on June 20 or 21, 2008. Mikell's counsel submitted his letter on June 24, 2008; Mikell voiced complaints during his interview on July 8, 2008; and Mikell was finally terminated on July 15, 2008. In other words, prior to the June 24 letter and July 8 interview, Mikell had already engaged in the "non-protected conduct that was the basis for the decision to terminate," and Marriott was already contemplating termination. *Curay-Cramer*, 450 F.3d at 137. An application of *Breeden* and *Curay-Cramer* leads to the conclusion that Mikell cannot assert retaliation claims based on the letter or interview as a result.

### 3. No Other Basis for Retaliation

With no retaliation stemming from Mikell's informal complaints, the only protected activities that remain in the parties' submissions are Mikell's 2004 and 2008 complaints to the PHRC; however, Mikell's retaliation claims cannot survive summary judgment based on these complaints either. First, Mikell has not advanced such an argument, and rather appears not to

oppose Defendant's Motion on this point. Furthermore, Mikell does not dispute that Marriott did not receive notice of his 2008 complaint until after his termination, with the result that his 2008 complaint could not serve as a basis for a retaliation claim in any event. *See, e.g.*, *Jones v. Sch. Dist.*, 198 F.3d 403, 415 (3d Cir. 1999). Finally, even if Mikell had argued retaliation based on his 2004 complaint, Defendant would still be entitled to summary judgment due to the lack of an apparent connection between the 2004 complaint and 2007 failed promotion, as well as between the 2004 complaint and 2008 termination.

In sum, Mikell has failed to satisfy the prima facie elements of a retaliation claim, and I will grant Defendant's Motion on those counts.

### D. Other Claims

In responding to Defendant's Motion for Summary Judgment, Mikell states that he is also asserting "a claim of discrimination and/or retaliation as to his being issued a series of written warnings and counselings, most of which were withdrawn, and as to being denied the position of a Server." Resp. 1 (internal citations omitted). Mikell then notes that "Defendant has not moved for summary judgment as to [these] claims." *Id.* In its reply, Defendant indicates that it had been unaware that Mikell was pursuing such allegations, and then repeats that it is indeed seeking summary judgment on all counts.[11] I will grant summary judgment in favor of Defendant as to these final claims due to the deficiencies of Mikell's Complaint.

Federal Rule of Civil Procedure 8 requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Failures on this front can result in summary judgment for the defendant. In *Vulcan Pioneers v. City of Newark*, 374 F.

---

[11] Defendant's original motion states that it is moving for summary judgment "on all counts of the Plaintiff's Complaint," although it does not specifically reference Mikell's server-related failure to hire claim or his warnings-related discriminatory and retaliatory discipline claims. Mem. Supp. Summ. J. 1.

App'x 313, 316 (3d Cir. 2010), for example, the plaintiff maintained that he had advanced a failure to promote claim as to a supervising specialist position in his complaint. The Third Circuit noted that the complaint made no mention of that particular position, and then commented that "'the factual detail in [the] complaint is so undeveloped that it does not provide . . . defendant[s] the type of notice of claim which is contemplated by Rule 8.'" *Id.* (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)). Therefore, the Third Circuit upheld the district court's grant of summary judgment as to that claim. *See also Brackshaw v. Miles, Inc.*, 723 F. Supp. 60, 61 (N.D. Ill. 1989) ("[T] the allegations of [plaintiff's] EEOC complaint are irrelevant to whether [plaintiff] adequately states a cause of action in her complaint before this court. Her complaint here must adequately allege a cause of action. Thus, because the complaint does not allege a continuing violation of Title VII, the court grants [defendant's] summary judgment on [plaintiff's] Title VII claim . . . .").

Similarly, in this case, Mikell did not mention any Server-related issues in his Complaint. With regard to the warnings, Mikell submitted only that he was "almost subjected to further discriminatory and retaliatory actions of Defendant, including being issued a series of written warnings and counselings, most of which were subsequently withdrawn." Compl. ¶ 19. Thus, Mikell's server claim is completely absent, and Mikell's warnings claim is extremely vague, fails to allege elements of discrimination or retaliation, and suggests a lack of injury.[12] In an Exhibit to his Complaint, Plaintiff's Second Amended Complaint to the PHRC, Plaintiff provides some detail about the warnings and counseling memos he received. Compl. Ex. 1. Plaintiff there also alleges that he was rejected for a Server position in retaliation. *Id.* However, these additions are

---

[12] Furthermore, according to Plaintiff, he was *almost* subjected to discrimination and retaliation, but most of the warnings and counseling were *withdrawn*. Thus, not only does Plaintiff's warnings claim fail to include a short and plain statement, but it also does not demonstrate entitlement to relief. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) ("In order to be entitled to relief, a plaintiff must have suffered a cognizable injury.").

insufficient to remedy the shortcomings of the Complaint itself. For these reasons, these claims should not be allowed to survive Defendant's Motion for Summary Judgment.

As an additional consideration, Rule 8(e) commands that "[p]leadings must be construed so as to do justice." Justice does not require such a forgiving standard that Mikell's Server and warnings claims be allowed to survive in this instance. To the contrary, it would be unjust to allow a plaintiff's case to survive summary judgment because of buried claims, not clearly identified in the complaint, or present only in attachments to the complaint. Defendants not on notice of such claims do not have the opportunity to pursue them in discovery, or to attempt to narrow the scope of—or entirely avoid—trial at the summary judgment stage of litigation. Thus justice here in fact requires granting Defendant's Motion as to any attempted claims made by Mikell relating to a Server position or warnings.

## V. Conclusion

For the reasons set forth above, I will grant in part and deny in part Defendant's Motion for Summary Judgment.

s/ Anita B. Brody
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to: